IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| PHILIP HATTABAUGH, | ) |
| Plaintiff, | ) 2:20-CV-00801-CCW |
| v. | ) |
| TMS INTERNATIONAL, LLC., | ) |
| Defendant. | ) |

### OPINION

Before the Court is a Motion for Summary Judgment, ECF No. 71, filed by Defendant TMS International, LLC ("TMS"). For the following reasons, the Motion will be DENIED.

**I.      Background**

  **A.      Procedural History**

Plaintiff Philip Hattabaugh commenced this case as a putative class and collective action,[1] ECF No. 1, alleging that TMS failed to pay all overtime wages owed to himself and similarly situated employees. *See id*. He filed an Amended Complaint on September 8, 2020, to "refine and clarify" the allegations against TMS. ECF No. 14. In his Amended Complaint, Mr. Hattabaugh alleges that TMS failed to pay him and other hourly employees proper overtime wages, in violation of the Fair Labor Standards Act, 29 U.S.C. §201, *et seq* ("FLSA"), and the Arkansas Minimum Wage Act, Ark. Code Ann. § 11-4-201, *et seq* ("AMWA").[2] *See* ECF No. 14, ¶ 2.

---

[1] In an Order dated December 10, 2021, the Court dismissed, without prejudice, opt-in plaintiff, Michael Walton for his failure to participate in the case. ECF No. 65.
[2] As relevant to this case, the FLSA and AMWA impose materially similar overtime requirements on employers; as such, the Court's FLSA-related analysis applies equally to Mr. Hattabaugh's AMWA claim. *See Ghess v. Kaid,* No. 2:19-cv-00021 KGB, 2020 U.S. Dist. LEXIS 222031 (E.D. Ark. Nov. 27, 2020) ("Apart from the AMWA's more relaxed provisions related to coverage, '[t]he FLSA and the AMWA impose similar minimum wage and overtime requirements on employers and, in cases involving claims brought under both acts, the courts have concluded that their parallel provisions should be interpreted in the same manner.'") (citation omitted).

Discovery closed without Mr. Hattabaugh having moved for either conditional certification of an FLSA collective or certification of a Rule 23 class. The lone opt-in plaintiff, Michael Walton, was later dismissed, pursuant to Rule 37, for failing to respond to discovery or otherwise participate in the case. *See* ECF No. 65. TMS then moved for summary judgment. *See* ECF No. 71. In its Motion, TMS seeks judgment in its favor on all of Mr. Hattabaugh's individual claims. *See id.* TMS' Motion is fully briefed and ripe for disposition.

B.  **Compliance with Local Rule of Civil Procedure 56**

TMS requests that the Court "strike responses to its Statement of Facts that do not comply with [Local Rule of Civil Procedure 56] and deem them admitted." ECF No. 78 at 2. According to TMS:

> Plaintiff's improper responses are of four varieties: (1) responses which deny (in whole or in part) a fact without any record citation (*see* Response to SOF ¶ 14, 15, 31, 56, 36, 56, 69) [ECF 76]; (2) responses which state that Plaintiff "lacks knowledge to admit or deny" the fact and, on that basis, deny the fact at issue (*see* Response to SOF ¶ 16, 39, 40); (3) responses which deny a fact without citation and include an internal reference to another response (*see* Response to SOF ¶ 44, 50, 51, 52, 53, 54, 60, 72, 74, 77, 79, 84, 87); and (4) responses which do not respond to the fact but instead contain extraneous comments (*see* Response to SOF, ¶ 6, 18, 43, 55, 61, 65, 69, 71, 78).

*Id.* at 1.

Local Rule 56 requires a party opposing summary judgment to file a responsive concise statement of material facts in which the nonmovant: (1) admits or denies "whether each fact contained in the moving party's Concise Statement is undisputed and/or material"; (2) sets forth "the basis for the denial if any fact contained in the moving party's Concise Statement is not admitted in its entirety…with appropriate reference to the record"; and (3) sets forth, "in separately numbered paragraphs any other allegedly material facts that are allegedly at issue." LCvR 56.C.1(a)–(c). Courts in this District generally require "strict compliance" with LCvR 56. *Mattis v. Overmeyer*, Case No. 1:16-cv-00306, 2019 U.S. Dist. LEXIS 103193, at *6 (W.D. Pa. June 20,

2019) (collecting cases).  Where a party fails to comply with the strictures of LCvR 56, "[a] [c]ourt [is] 'entitled to deem [Defendants'] statement of facts as admitted.'"  *DeForte v. Borough of Worthington*, 364 F. Supp. 3d 458, 461 n.3 (W.D. Pa. 2019) (quoting *Smith v. Addy*, 343 F. App'x 806, 808 (3d Cir. 2009) (emphasis added).

Although Mr. Hattabaugh's responsive concise statement may fail to dot every "i" and cross every "t" as perfect compliance with LCvR 56 would require, TMS's request to strike, in the Court's estimation, unduly favors form over substance.  "The purpose of Local Rule 56.1 is to aid the court in deciding a motion for summary judgment by identifying material facts and supporting documentation to determine whether or not the fact is disputed."  *Bouriez v. Carnegie Mellon Univ.*, No. Civ.A. 02-2104, 2005 WL 2106582, *3 (W.D.Pa. Aug. 26, 2005) (citing then-LCvR 56.1, now LCvR 56).  In general, Mr. Hattabaugh's responsive concise statement accomplishes this purpose—stating whether a fact is admitted or denied, in whole or in part, and identifying (whether by directly citing, or through cross-reference) evidence to support his denials.  *See, e.g.*, ECF No. 76 ¶¶ 43–44..  However, some of Mr. Hattabaugh's responses do not raise a genuine dispute, or only contest a particular legal conclusion that TMS' concise statement suggests could or should be drawn from a particular fact.  *See, e.g.*, *id.* ¶¶ 31 (disputing TMS' contention as to the "premise" underlying Mr. Hattabaugh's claims) and 39 (denying fact on ground Mr. Hattabaugh lacks knowledge).  In any case, while the Court declines to either grant TMS' request to strike wholesale or rule separately on each of the paragraphs cited by TMS in its Reply, the Court will determine whether particular facts should be deemed admitted on a case-by-case basis, and whether Mr. Hattabaugh's responsive concise statement points to a genuine dispute of fact.

C.     **Material Facts**

The following facts are undisputed, unless noted otherwise.  TMS is a provider of on-site industrial steel mill services for steelmakers.  *See* ECF No. 76 ¶ 2.  TMS contracted with Gerdau, "one of the largest producers of long steel in Latin America, with plants in both Latin America and the United States," to provide slag-removal services at Gerdau's mill in Fort Smith, Arkansas ("Fort Smith").  *See id.* ¶ 3.  TMS employed Mr. Hattabaugh as a pit operator at Fort Smith from August 28, 2017, to May 20, 2020.  *See* ECF No. 76 ¶ 1.  TMS provided Mr. Hattabaugh with an employee handbook and training, which, in relevant part, informed him of TMS' time keeping procedures and rules for entering time for pay for hourly employees.  *See* ECF No. 76, ¶¶ 5–15.  Pursuant to those policies, TMS required Mr. Hattabaugh to clock in and out for each shift he worked, using some combination of a mechanical punch-card system and a biometric thumbprint scanner.  *See* ECF No. 76 ¶¶ 4, 6, 38.  Sometime in January 2020, TMS moved exclusively to the biometric scanner time keeping system.  *See* ECF No. 76 ¶ 46.  Then, in March of 2020, due to the COVID-19 pandemic, TMS stopped using the thumbprint scanner in an attempt to curtail the transmission of the virus;  in its place, TMS implemented a system whereby a TMS employee would manually document Mr. Hattabaugh's and other hourly production employees' punch-in/punch-out information.  *See* ECF No. 76 ¶¶ 47–48.

Mr. Hattabaugh agrees that he clocked his hours and received commensurate pay, including overtime pay, without incident from August 28, 2017, until July of 2019.  *See* ECF No. 76 ¶ 66.  In the first two years of his employment Mr. Hattabaugh and each of the other three pit operators (for a total of four) typically worked three or four 12-hour shifts per week.  *See* ECF No. 76 ¶ 29.  Then, by mid-September 2019, two of the pit operators, Doug Martindale and Colin Strausman, were fired, leaving only Mr. Hattabaugh and one other pit operator each to handle either a 12-hour shift (day or night) for the days that the Fort Smith mill operated.  *See id.* ¶ 73; *see also* ECF No.

4

74-1 at 14:18-25. Mr. Hattabaugh asserts that to cover the work of the terminated pit operators he needed to work 84 to 87 hours per week. *See* ECF No. 76 ¶ 65 (Hattabaugh Response). However, according to Mr. Hattabaugh, TMS's site manager at Fort Smith, Ryan Moore, told Mr. Hattabaugh to keep his hours below 62 hours a week. *See id.* Mr. Hattabaugh claims that, although he worked 84 to 87 hours per week, he was paid for substantially fewer hours than he worked, and that some of that time was paid as "straight time" for dates he actually did not work. *See id.* Mr. Hattabaugh states that he talked to Mr. Moore about the alleged issues with his pay on a regular basis. *See id.*

TMS disputes Mr. Hattabaugh's testimony, and has offered (1) its time keeping policies; (2) records of Mr. Hattabaugh's time entries; and (3) a declaration from Mr. Moore denying that he instructed Mr. Hattabaugh to work off-the-clock, that he adjusted Mr. Hattabaugh's records to reduce his overtime, that TMS's time keeping was inappropriate or inaccurate, that Mr. Hattabaugh was not paid for all hours worked, or that Mr. Hattabaugh ever raised concerns about his pay to Mr. Moore. *See* ECF No. 74-2–74-8.

Finally, except for Mr. Hattabaugh's testimony that Fort Smith did not operate around Thanksgiving and Christmas 2019, and that operations slowed beginning in March 2020 due to the pandemic, neither party has presented either a contemporaneous shift schedule for TMS' employees at Fort Smith or any documentation of the dates that Fort Smith was shut down.

**II.    Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Summary judgment is appropriate when the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." *Mann v. Palmerton Area Sch. Dist.*, 872 F.3d 165, 170 (3d Cir. 2017) (internal citations

5

and quotations omitted). "A factual dispute is 'genuine' if the 'evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Razak v. Uber Techs., Inc.,* 951 F.3d 137, 144 (3d Cir. 2020) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "A factual dispute is 'material' if it 'might affect the outcome of the suit under the governing law.'" *Id.* (quoting *Anderson*, 477 U.S. at 248).

The burden to establish that there is no genuine dispute as to any material fact "remains with 'the moving party regardless of which party would have the burden of persuasion at trial.'" *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1080 (3d Cir. 1996) (quoting *Chipollini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896 (3d Cir. 1987)). That said, "[i]f the non-moving party bears the burden of persuasion at trial, 'the moving party may meet its burden on summary judgment by showing that the nonmoving party's evidence is insufficient to carry that burden.'" *Kaucher v. County of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (quoting *Wetzel v. Tucker*, 139 F.3d 380, 383 n.2 (3d Cir. 1998)).

Once the moving party has carried its initial burden, the party opposing summary judgment "must do more than simply show that there is some metaphysical doubt as to the material facts…. Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986) (citations omitted). Thus, while "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor," *Anderson*, 477 U.S. at 255, summary judgment "requires the nonmoving party to go beyond the pleadings" and point to "'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (citation omitted). But, while the court must "view the facts in the light most favorable to the non-moving party and draw all reasonable inferences in that party's favor…to

6

prevail on a motion for summary judgment, the non-moving party must present more than a mere scintilla of evidence; there must be evidence on which the jury could reasonably find for the [non-movant]." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013) (internal citations and quotations omitted). If the non-moving party "fails to make a showing sufficient to establish the existence of an element essential to [the non-movant's] case, and on which [the non-movant] will bear the burden of proof at trial," Rule 56 requires the entry of summary judgment because such a failure "necessarily renders all other facts immaterial." *Celotex*, 477 U.S. at 322–23; *Jakimas v. Hoffman La Roche, Inc.*, 485 F.3d 770, 777 (3d Cir. 2007).

### III.   Discussion

TMS seeks summary judgment here on the basis that Mr. Hattabaugh's allegedly "self-serving testimony is not sufficient as a matter of law to withstand summary judgment." ECF No. 72 at 1. In short, TMS contends that Mr. Hattabaugh's testimony—which, according to TMS, is vague, contradictory, and unsupported by any other evidence—without more cannot generate a material dispute of fact sufficient to send this case to a jury. *See id.* at 13–18. Finally, if the Court does not grant TMS' Motion with respect to the merits of Mr. Hattabaugh's claims, TMS seeks a ruling dismissing Mr. Hattabaugh's claim for liquidated damages because "no trier of fact could reasonably conclude that TMS failed to act in good faith or with reasonable grounds to believe its actions were not a violation of the FLSA." *Id.* at 3, 19–20.

At bottom, TMS' Motion asks the Court to resolve three questions: (1) whether Mr. Hattabaugh's deposition testimony should be disregarded as impermissibly "self-serving;" *see Vashisht v. Sidhu Subs, LLC,* No. 19-1509, 2021 U.S. Dist. LEXIS 218032, at *12–13 (W.D. Pa. Nov. 10, 2021) (Horan, J.); (2) whether Mr. Hattabaugh has failed to produce evidence "'from which violations of the [FLSA] and the amount of an award may be reasonably inferred,'" *Rosano v. Twp. of Teaneck*, 754 F.3d 177, 189 (3d Cir. 2014) (quoting *Martin v. Selker Bros., Inc.*, 949

7

F.2d 1286, 1297 (3d Cir. 1991));  and, finally, (3) whether TMS "acted in good faith and…had reasonable grounds for believing that it was not violating the [FLSA]," such that Mr. Hattabaugh's claim for liquidated damages should be dismissed. *Sec'y United States DOL v. Am. Future Sys.*, 873 F.3d 420, 433 (3d Cir. 2017) (citing 29 U.S.C. § 260; *Selker Bros.*, 949 F.2d at 1299).  Because the Court answers "no" to all three questions, TMS' Motion will be denied.

A.     **Mr. Hattabaugh's Testimony Is Not Impermissibly Self-Serving**

Central to TMS' Motion is its contention that Mr. Hattabaugh cannot rely on his own, purportedly "self-serving," deposition testimony to survive summary judgment. *See* ECF No. 72 at 13–18.  TMS contends that Mr. Hattabaugh's testimony is impermissibly speculative and insufficient to discredit TMS' evidence, such that a reasonable fact-finder could not find in favor of Mr. Hattabaugh. *See* ECF No. 72 at 15–16.  The Court disagrees.

The general rule that "conclusory, self-serving affidavits are insufficient to withstand a motion for summary judgment," *Gonazales v. Sec'y of the Dep't of Homeland Sec.*, 678 F.3d 254, 263 (3d Cir. 2012), has been extended to self-serving deposition testimony. *See Irving v. Chester Water Auth.*, 439 Fed.Appx. 125, 127 (3d Cir. 2011)*; see also Hanna v. Giant Eagle Inc.*, Civil Action No. 15-1009, 2017 U.S. Dist. LEXIS 34699, at *39–40 (W.D. Pa. Mar. 6, 2017) (Mitchell, M.J.).  "At summary judgment, the ultimate question is whether self-serving testimony, 'when considered in conjunction with other evidence, is sufficient for a rational factfinder to credit [the declarant's] testimony, in spite of the testimony's self-serving nature.'" *Vashisht,* 2021 U.S. Dist. LEXIS 218032, at *12–13 (quoting *Hanna*, 2017 U.S. Dist. LEXIS 34699, at *40);  *see Scott v. Harris*, 550 U.S. 372, 380 (2007) ("When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of facts for the purposes of ruling on a motion for summary judgment.");

8

*Gonzales*, 678 F.3d at 263; *Irving*, 439 F. App'x at 127 ("In light of both his earlier testimony and other record evidence, [plaintiff's] self-serving deposition testimony is insufficient to raise a genuine issue of material fact."). Here, the trouble for TMS is that, while Mr. Hattabaugh's testimony about his alleged off-the-clock work is vague in places, his testimony provides sufficient detail on a few key points and, apart from Mr. Moore's declaration, is otherwise not "blatantly contradicted" by the other record evidence.

First, Mr. Hattabaugh's testimony is not so speculative that a rational factfinder would be unable to credit it in spite of its self-serving nature because Mr. Hattabaugh provided sufficient detail as to certain key aspects of his claims. Specifically, Mr. Hattabaugh testified (1) that he recalls the alleged issues with his overtime pay being tied to TMS' reduction from four pit operators to two sometime in the summer of 2019, *see* ECF No. 74-1 at 17:7–15; (2) that after TMS went to two pit operators, Mr. Hattabaugh and the other pit operator typically worked back-to-back 12-hour shifts when Fort Smith was operating, *see id.* at 12:1–5; (3) that Mr. Moore instructed Mr. Hattabaugh not to clock-in from time to time, *see id.* at 76:23–25; and (4) that Mr. Moore manipulated Mr. Hattabaugh's time records to either "shave" hours or to move hours from one week to another in order to limit the amount of overtime TMS paid to Mr. Hattabaugh. *See id.* at 76:2–12; 79:19–80:2 In other words, Mr. Hattabaugh's testimony provides at least the proverbial "who, what, where, when, why, and how" of his claims.

Second, Mr. Hattabaugh's testimony is not "blatantly contradicted" by the other evidence in the record. In short, the "contradictions" TMS points to are either immaterial or, if material, reflect only potential credibility issues Mr. Hattabaugh may face at trial, without rising to the level necessary for the Court to disregard Mr. Hattabaugh's testimony at summary judgment. For example, TMS points to issues such as: (1) Mr. Hattabaugh's testimony about TMS supposedly

"losing" its contract with Gerdau (TMS did not lose the contract); (2) his testimony that pit operator Doug Martindale was fired in July 2019 (Mr. Martindale was not fired until mid-September 2019); (3) Mr. Hattabaugh's testimony that Mr. Moore told him to keep his hours under 62 per week (Mr. Hattabaugh recorded more than 60 hours in 11 out of 43 weeks); and (4) the supposed incongruity between TMS maintaining facially lawful wage and hour policies—under which Mr. Hattabaugh was correctly paid for about two years—and the apparently sudden and inexplicable decision to begin having Mr. Hattabaugh work off the clock in late summer 2019. Issues (1) and (4) are immaterial because neither impacts a burden of production Mr. Hattabaugh, as the plaintiff, must meet. That is, Mr. Hattabaugh is under no legal obligation to put forward evidence as to why TMS made him work off the clock; rather, Mr. Hattabaugh only "bears 'the burden of proving that [an employee] performed work for which he was not properly compensated.'" *Vashisht*, 2021 U.S. Dist. LEXIS 218032, at *10 (quoting *Sec'y U.S. Dep't of Labor v. Central Laundry, Inc.*, 790 Fed. Appx. 368 (3d Cir. 2019). Issues (2) and (3), while material to Mr. Hattabaugh's claims, tend to go only to either reducing the relevant period at issue (i.e., using September 2019, rather than July 2019, as the start point) or undermining Mr. Hattabaugh's allegations as to the extent (but not necessarily the fact) of unpaid overtime. In other words, the other record evidence, while perhaps undercutting Mr. Hattabaugh's testimony in certain respects, does not directly contradict the central thrust of Mr. Hattabaugh's claims, namely, that he worked substantial hours off the clock for TMS.[3]

---

[3] The Supreme Court's decision in *Scott v. Harris* is a useful counterpoint here. In that case, the Court determined that plaintiff's testimony that he was driving safely was directly contradicted by video evidence of plaintiff driving erratically, crossing the center line, etc. *See* 550 U.S. at 378–80. Here, unlike the video evidence in *Scott*, the supposed issues TMS points to impact Mr .Hattabaugh's claims at the margins, without directly undermining key portions of Mr. Hattabaugh's testimony—namely, that he worked extensive, improperly compensated overtime, especially after TMS went to two pit operators; that he reported issues with his pay to his supervisor, Mr. Moore; and that Mr. Moore directed Mr. Hattabaugh to not clock in or otherwise altered Mr. Hattabaugh's time records to reduce his overtime. ..

Furthermore, while not thoroughly corroborating his claims, Mr. Hattabaugh's time sheets lend some support to his testimony. For example, Mr. Hattabaugh points to a series of entries related to January 15, 2020, which appear to show Mr. Moore altering Mr. Hattabaugh's punch times to reduce the amount of time recorded for Mr. Hattabaugh that day by about five hours. *See* ECF No. 76 ¶ 76. The Court also notes that, during the period at issue, Mr. Moore appears to have edited Mr. Hattabaugh's time entries on a regular basis and, indeed, on multiple occasions appears to have been responsible for punching Mr. Hattabaugh both in and out for shifts. *See, e.g.* ECF No. 74-6 at 200–268 (Hattabaugh "Timecard Audit Trail" for July–October 2019), In other words, while not direct evidence of violations, Mr. Hattabaugh's time sheets, viewed in the light most favorable to him, lend some credence to his allegation that TMS, through Mr. Moore, manipulated his time sheets.

Ultimately, then, TMS is urging the Court to find that Mr. Hattabaugh's testimony is not worthy of credit because it is not wholly consistent with TMS' records or the declaration of TMS' former manager, Mr. Moore. But, given the (1) sufficiently specific details provided by Mr. Hattabaugh in his testimony and (2) what appears to be a genuine dispute as to the accuracy of TMS' records, weighing credibility is beyond the Court's role at summary judgment, and is rather a task properly left to the jury. Accordingly, the Court cannot conclude that Mr. Hattabaugh's deposition testimony is either impermissibly speculative or self-serving, and will give it due consideration in resolving TMS' Motion.

### B. *Mt. Clemens*, not *Seever*, Applies to Mr. Hattabaugh's Claims

Next, before turning to TMS' challenge to the merits of Mr. Hattabaugh's claims, we must address TMS' argument that the Court should apply the standard for evaluating FLSA claims articulated in *Seever v. Carrols Corp.*, 528 F. Supp. 2d 159, 169 (W.D.N.Y. 2007), rather than the

more familiar burden-shifting framework announced by the Supreme Court in *Anderson v. Mt. Clemens Pottery Co.*, 328 U.S. 680 (1946) and applied by our Court of Appeals in cases like *Selker Bros.,* 949 F.2d 1286.

Under *Mt. Clemens*, the general rule in FLSA cases is that, once an employee establishes that the employer's records are inaccurate or inadequate—by, for example, establishing that "'he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference,'" *Tyson Foods, Inc. v. Bouaphakeo*, 577 U.S. 442, 456 (2016) (quoting *Mt. Clemens*, 328 U.S. at 687)—the burden shifts to the employer to "'come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.'" *Id.* (quoting *Mt. Clemens*, 328 U.S. at 687–88). "If the employer fails to produce such evidence, the court may then award damages to the employee, even though the result be only approximate." *Mt. Clemens*, 328 U.S. at 688.

The district court in *Seever* held that an employee cannot benefit from the *Mt. Clemens* burden-shifting rule where "the time record 'deficiencies' alleged by the employee are admittedly and voluntarily self-created." *Seever*, 528 F.Supp.2d at 170 (noting that "[h]ere, it is undisputed that [defendant's] record-keeping complied with the requirements of the FLSA and New York Labor Law, and that the plaintiffs' time records were maintained and paid exactly as plaintiffs fashioned them, meaning that any inaccuracies in [defendant's] records are *solely due to the plaintiffs' deliberate failure to accurately report the time they worked*.") (emphasis original). In other words, the court in *Seever,* short of finding a true "exception," simply articulated a necessary precondition that is implicit to the *Mt. Clemens* rule: the alleged inaccuracy or inadequacy in the employer's records must be in some way caused by or attributable to the actions of the employer

12

before the employee can benefit from the *Mt. Clemens* rule. *See Mt. Clemens*, 328 U.S. at 687 (finding that "the remedial nature of [the FLSA] and the great public policy which it embodies" would be undermined if an employee would be denied "recovery on the ground that he is unable to prove the precise extent of uncompensated work. Such a result would place a premium on an employer's failure to keep proper records in conformity with his statutory duty; it would allow the employer to keep the benefits of an employee's labors without paying due compensation as contemplated by the Fair Labor Standards Act.").

Here, while it is undisputed that, per TMS policy, Mr. Hattabaugh was, in general, responsible for punching in and out at the beginning and end of each shift, *see* ECF No. 76 ¶¶ 6, 9, Mr. Hattabaugh claims, and TMS disputes, that Mr. Moore directed Mr. Hattabaugh to not clock in for some shifts and also modified Mr. Hattabaugh's time records so as to "shave" Mr. Hattabaugh's overtime hours. *See id.* ¶¶ 65, 76. To that end, it is also undisputed that Mr. Moore, as Mr. Hattabaugh's supervisor, was ultimately responsible for approving Mr. Hattabaugh's timecards before they were sent to payroll. *See id.* ¶ 59. In that function, Mr. Moore had the ability to edit Mr. Hattabaugh's time records (according to Mr. Moore, this was only done to ensure accuracy), which he appears to have done more than occasionally during the relevant period. *See id.* ¶¶ 51–53; *see also* ECF No. 74-6 at 200–268. Furthermore, at least from March 2020 to Mr. Hattabaugh's termination in May 2020, Mr. Moore (or some other TMS employee) was responsible for recording Mr. Hattabaugh's time due to changes in time-recording practices brought on by the COVID-19 pandemic. *See* ECF No. 76 ¶¶ 47–49. Finally, it appears from the Court's review of Mr. Hattabaugh's time sheets that, even before March 2020, someone other than Mr. Hattabaugh recorded Mr. Hattabaugh's shift start and stop times on multiple occasions. *See,*

*e.g,* ECF No. 74-6 at 252 (records appearing to show Mr. Moore recording 7:00 a.m. to 7:00 p.m. shifts for Mr. Hattabaugh on October 2–3, 2019).

Accordingly, based on the present record, the Court cannot conclude that the alleged inaccuracy or inadequacy in TMS' records is solely the result of Mr. Hattabaugh's "deliberate failure to accurately report the time [he] worked." *Seever*, 528 F.Supp.2d at 170. Instead, viewing the facts in the light most favorable to Mr. Hattabaugh and drawing reasonable inferences in his favor, as we must at summary judgment, a reasonable jury could find that any inaccuracies in Mr. Hattabaugh's time records were caused by TMS, not Mr. Hattabaugh; therefore, for the purposes of resolving the instant Motion, the Court will apply the *Mt. Clemens* burden-shifting framework.

### C. A Reasonable Jury Could Find for Mr. Hattabaugh Based on the Record

As to the merits, TMS argues that Mr. Hattabaugh has not pointed to evidence from which a reasonable jury could conclude that he worked off the clock. *See* ECF No. 72 at 13. But, having already found that (1) the *Mt. Anderson* burden-shifting framework applies and (2) Mr. Hattabaugh's testimony is not so self-serving that it must be disregarded at summary judgment, the Court concludes that there is sufficient evidence in the record from which a reasonable jury could find for Mr. Hattabaugh.

Under the FLSA, an employer must pay an employee at one-and-a-half times the employee's regular rate for hours worked in excess of 40 in a given work week. *See* 29 U.SC. § 207(a). As noted above, under *Mt. Clemens*, once an employee establishes that an employer's records are inaccurate or inadequate, the employee carries his burden "'if he proves that he has in fact performed work for which he was improperly compensated and if he produces sufficient evidence to show the amount and extent of that work as a matter of just and reasonable inference.'" *Bouaphakeo*, 577 U.S. at 456 (quoting *Mt. Clemens*, 328 U.S. at 687). "'[T]he burden then shifts

to the employer to come forward with evidence of the precise amount of work performed or with evidence to negative the reasonableness of the inference to be drawn from the employee's evidence.'" *Id.* (quoting *Mt. Clemens* at 687–88).

Here, Mr. Hattabaugh claims that, from in or about July 2019 to in or about May 2020, TMS failed to pay him all of the overtime wages he was owed (although, it should be noted, Mr. Hattabaugh's testimony appears to clarify that the period in question is, in fact, August 2019 to March 2020, *see* ECF No. 74-1 at 87:19–22 ("Q: You worked from July 2019 to May 2020 without being adequately compensated. A: No. I never said May. I said March and I said August, they got us some relief."). To that end, Mr. Hattabaugh's testimony, taken as true, establishes that after the firing of Mr. Martindale in 2019, TMS only employed two pit operators at Fort Smith, and that the mill could not run without a pit operator working. *See* ECF No. 74-1 at 86:23–87:4. As a result, Mr. Hattabaugh and the remaining pit operator worked back-to-back 12-hour shifts when Fort Smith was running. *See id.* at 14:4–15:1. Mr. Hattabaugh testified that the mill did not run continuously during this time (*i.e.*, from July 2019 to his firing in May 2020), and he recalled specifically that the mill was down for a period around Thanksgiving, Christmas, and in March 2020, the latter caused by the pandemic. *See* ECF No. 76 ¶¶ 30, 69. As noted above, Mr. Hattabaugh testified that Mr. Moore instructed him not to clock in for certain shifts, or would otherwise alter his time records, in order to restrict the amount of overtime paid to Mr. Hattabaugh. According to Mr. Hattabaugh, he raised concerns about his overtime pay with Mr. Moore on multiple occasions. And, while Mr. Moore's declaration strenuously denies Mr. Hattabaugh's allegations, *see* ECF No. 74-8, the punch cards and time records submitted by TMS, viewed in the light most favorable to Mr. Hattabaugh arguably lend some corroboration to his claims.

For example, the punch card records appear to show that Mr. Hattabaugh worked (1) from about 1:00 p.m. to about 1:00 a.m. on September 15–16, 2019; (2) from about 1:00 p.m. to about 1:00 a.m. on September 16–17, 2019 (although, it should be noted, handwritten times are superimposed over the punch card times for this entry, making the original punch times impossible to read); and (3) from about 3:30 p.m. to midnight on September 17. *See* ECF No. 74-5 at 146–47. The "Time Detail" report shows shifts (1) and (3) noted above, but not shift (2). *See* ECF No. 74-6 at 370 (recording a 12:50 p.m. to 1:00 a.m. shift for September 15 and a 3:22 p.m. to 11:58 p.m. shift for September 17). The "Timecard Audit Trail" appears to show Mr. Moore adding, editing, and, ultimately, deleting punches for what would have been an approximately 3:00 p.m. to 3:00 a.m. shift for Mr. Hattabaugh on September 16–17, 2019—indeed, the Timecard Audit Trail appears to show Mr. Hattabaugh recording a punch at 3:18 a.m. on September 17 (this would, presumably, be the "out" punch for shift (2), September 16–17) and another at 3:21 p.m. on September 17 (the "in" punch for shift (3), September 17). *See* ECF No. 74-6 at 233–37. Finally, the Court notes that, two weeks later, there are a pair of 12-hour shifts for October 2 and 3, 2019, which appear as handwritten notations on Mr. Hattabaugh's punch cards and as having been entered on the Timecard Audit Trail by Mr. Moore alone. *See* ECF No. 74-5 at 151; ECF No. 74-6 at 252. Per the punch cards, apart from the handwritten notations, Mr. Hattabaugh appears to have worked only two shifts in the week of September 30 to October 6, 2019. *See* ECF No. 74-5 at 151. The Court notes that Mr. Hattabaugh points to another such inconsistency in the Timecard Audit Trail, where it arguably appears Mr. Moore shaved five hours from Mr. Hattabaugh's January 15, 2020, shift. *See* ECF No. 76 ¶ 76 (asserting that records show "if Plaintiff is interpreting the records correctly, that on 1/20/2020, Ryan Moore deleted Plaintiff's 6:33 p.m. clock-in from 1/15/2020, and added an 11:34 p.m. clock-in instead") (citing ECF No. 74-6 at 304).

Coupled with Mr. Hattabaugh's testimony, and viewed in the light most favorable to Mr. Hattabaugh, these records can be interpreted as being consistent with Mr. Hattabaugh's assertion that (1) TMS' records are not accurate and (2) that, through Mr. Moore, TMS manipulated Mr. Hattabaugh's time records to minimize Mr. Hattabaugh's overtime. The Court notes, too, that one of the above cited examples of apparent inconsistency in TMS' records predates September 19, 2019, lending support to Mr. Hattabaugh's claim that issues with his overtime pay predated Mr. Martindale's firing. *See* ECF No. 74-1 at 17:7–10 ("Well, it went on a lot even before the four crews because we had guys that would get sick. I mean, you would end up working a lot of hours. They had them two guys there because we was shorthanded anyway."). TMS, of course, disputes that its records are inaccurate, and offers the declaration of Mr. Moore to explain, in summary fashion, the various notations and edits on the punch cards and electronic time records. *See* ECF No. 74-8.

Next, TMS argues that there is no evidence that it had any actual or constructive knowledge of Mr. Hattabaugh's unpaid or improperly paid overtime. *See* ECF No. 72 at 18–19. But, Mr. Hattabaugh testified that he reported issues with his pay to Mr. Moore, that Mr. Moore told him not to clock in for certain shifts, and that Mr. Moore altered his time records. As discussed above, viewed in the light most favorable to Mr. Hattabaugh, portions of the time records arguably support his testimony, at least as it relates to Mr. Moore allegedly altering time records to reduce overtime. And, aside from a cursory argument in a footnote that, even assuming Mr. Hattabaugh's allegations to be true, Mr. Moore was acting outside the scope of his employment, *see* ECF No. 72 at 18 n.7, "it is widely accepted that courts may impute the knowledge of an employee's supervisor to that of the employer." *Stewart v. Pemberton Twp.*, No. 14-6810, 2022 U.S. Dist. LEXIS 58928, at *19

17

(D.N.J. Mar. 29, 2022) (collecting cases). There is, therefore, a genuine dispute as to whether TMS had knowledge of the allegedly unpaid or improperly paid overtime.

Finally, while the Court is cognizant of the apparent discrepancy between Mr. Hattabaugh's claim that he worked approximately seven 12-hour shifts every week for the relevant period and his testimony that Fort Smith was periodically shut down for business reasons, holidays, and the like, *see* ECF No. 74-1 at 12:16–19 ("I mean, they were shut down – like I told you, it randomly hit on the orders, but I know we shut down a week during the week of Thanksgiving…and then Christmas, we was off right around I think 10 or 12 days."), under *Mt. Clemens* the effect of any imprecision in the *amount* of unpaid wages that can reasonably be inferred—rather than the bare fact that wages due were not paid—is to be borne by the employer, not the employee. *See Mt. Clemens*, 328 U.S. at 688 (where the employee has met his or her burden, "[t]he uncertainty lies only in the amount of damages arising from the statutory violation by the employer. In such a case 'it would be a perversion of fundamental principles of justice to deny all relief to the injured person, and thereby relieve the wrongdoer from making any amend for his acts.'") (citation omitted).[4]

Accordingly, the Court concludes that there is a genuine dispute of fact and that, viewed in the light most favorable to Mr. Hattabaugh, a reasonable jury could find both that Mr. Hattabaugh

---

[4] Indeed, this case is distinguishable from *Rosano v. Twp. of Teaneck*, 754 F.3d 177 (3d Cir. 2014), on which TMS relies. Specifically, although Mr. Hattabaugh, like the *Rosano* plaintiffs, estimates the extent of his unpaid overtime based solely on his own recollection, the decision in *Rosano* resulted from plaintiffs "failing to provide any basis for discerning whether the hours worked by each individual officer exceeded the necessary threshold for overtime under the FLSA, which defines overtime entitlement based upon a work period and not a work day" or "to account for Teaneck's exemption under § 207(k), which increases the number of hours Teaneck officers may work in a work period before triggering overtime requirements." *Rosano*, 754 F.3d at 189. Here, Mr. Hattabaugh has estimated his unpaid overtime based on the correct workweek framework, *see* ECF No. 74-12, and there do not appear to be any exemptions from the usual overtime rules to which TMS would be entitled. Accordingly, the court's basis for finding that the *Rosano* plaintiffs "fail[ed] to set forth any evidence of alleged uncompensated overtime, whether it be actual or estimated" is inapplicable here.

"performed work for which he was improperly compensated" and determine "the amount and extent of that work as a matter of just and reasonable inference." *Mt. Clemens*, 328 U.S. at 687.

### D. Liquidated Damages

Finally, TMS contends that even if Mr. Hattabaugh's claim survives summary judgment, he would not be entitled to liquidated damages because TMS acted in good faith to comply with the FLSA so as a matter of law it would not be subject to liquidated damages. *See* ECF No. 72 at 19–20 (citing *Lugo v. Farmer's Pride Inc.*, 802 F. Supp. 2d 598, 616 (E.D. Pa. 2011).

Liability for liquidated damages is "mandatory" unless the employer shows both "that it acted in good faith and that it had reasonable grounds for believing it was not violating the Act." *Sec'y United States DOL v. Am. Future Sys.*, 873 F.3d 420, 433 (3d Cir. 2017). According to the Third Circuit, "[t]he good faith requirement is 'a subjective one that requires that the employer have an honest intention to ascertain and follow the dictates of the [FLSA]" and "[t]he reasonableness requirement is an objective standard." *Id.* Ultimately, "[a]n employer bears a 'plain and substantial' burden to prove it is entitled to discretionary relief from liquidated damages." *Id.*

Here, although there appears to be no dispute that TMS maintained facially lawful written wage and hour policies, the evidence at summary judgment, viewed in the light most favorable to Mr. Hattabaugh, shows that Mr. Moore, a management-level TMS employee, instructed Mr. Hattabaugh not to clock in for certain shifts and/or deliberately altered Mr. Hattabaugh's time records to reduce Mr. Hattabaugh's overtime hours. Accordingly, based on the present record and in the summary judgment context, "[TMS] cannot meet [its] 'plain and substantial' burden" such that it is entitled to dismissal of Mr. Hattabaugh's liquidated damages claim. *Solis v. A-1 Mortgage Corp.*, 934 F.Supp.2d 778, 815 (W.D. Pa. 2013) (finding that "by instructing employees to alter

their time sheets to reduce their hours worked and, in [one employee's] case to report to the DOL, if questioned, that he had 'no complaints' despite not being paid at least a minimum wage on a bi-weekly basis," relief from liquidated damages was not warranted).

**IV.     Conclusion**

For the foregoing reasons, TMS' Motion for Summary Judgment, ECF No. 71, will be DENIED.

DATED this 4th day of August, 2022.

BY THE COURT:

/s/ Christy Criswell Wiegand
CHRISTY CRISWELL WIEGAND
United States District Judge

cc (via ECF email notification):

All Counsel of Record